**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
James M. Treglio (SBN 228077)
Isabel Rose Masanque (SBN 292676)
classactions@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiff, on behalf of himself and all others similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHERIF SHERIF, on behalf of himself and all others similarly situated

Plaintiff,

v.

BEENVERIFIED, LLC., a Delaware Limited Liability Company; and DOES 1-100, inclusive

Defendants.

CASE NO. 4:26-cv-01506-JST

**FIRST AMENDED CLASS COMPLAINT FOR VIOLATIONS OF:**

**(1) PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);**
**(2) WIRETAP ACT, 28 U.S.C. § 2510 *et seq*.**
**(3) CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);**
**(4) ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and**
**(5) CAL. BUS. & PROF. CODE §17200, ET SEQ. (CALIFORNIA UNFAIR COMPETITION LAW)**

**DEMAND FOR JURY TRIAL**

Class Representative Plaintiff Sherif Sherif ("Plaintiff"), by and through his attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1. Defendant BeenVerified, LLC ("Defendant") owns and operates the website located at https://www.beenverified.com/ and related pages, including its homepage, people-search pages, reverse phone lookup pages, report-preview pages, account-creation pages, subscription pages, and payment pages (collectively, the "Website" or "BeenVerified").

2. Defendant markets the Website as a people-search and public-records service through which consumers can search names, phone numbers, addresses, email addresses, vehicles, properties, and other identifiers to determine what personal information is available about themselves and others. The communications at issue in this case are not ordinary product-browsing communications on a generic retail website. They are communications revealing that a particular California user searched for, typed, selected, and interacted with personal and potentially sensitive identity information on a people-search website, including Plaintiff's phone number, his name, Sherif Sherif, Plaintiff's address information, and names, addresses, and phone numbers concerning Plaintiff, his mother, his wife, friends, and other family members that Plaintiff typed, clicked, selected, or submitted. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

3. When Plaintiff and Class Members visited the Website, Defendant caused third-party code, scripts, cookies, pixels, beacons, software development kits, session-replay tools, device-fingerprinting tools, payment/analytics scripts, and other tracking processes (collectively, the "Trackers") to be downloaded to, installed on, and executed inside their browsers and devices. Those Trackers included, without limitation, Microsoft Clarity, Google Tag Manager, Google tracking code, MaxMind Device Detection, Cloudflare analytics/security code, OneTrust/CookieLaw code, Braintree/PayPal/Google Pay scripts on subscription/payment pages, TokenEx code, DigiCert code, and other third-party requests identified by technical testing.

4. Defendant's Trackers did not merely count pageviews or operate as passive server logs. They caused Plaintiff's browser to send contemporaneous, event-level transmissions to third-party servers as Plaintiff typed, clicked, searched, scrolled, moved his cursor, selected search categories, interacted with search and entered personal information. The data transmitted included the substance and meaning of Plaintiff's Website communications, including phone-number, name, and address search terms; page URLs and URL paths reflecting people-search, reverse-phone-lookup, address-search, search-page, and search buttons, links, and other specific Plaintiff interactions while attempting to locate personal information from BeenVerified. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

5. Forensic testing performed before any meaningful user consent was obtained confirmed that BeenVerified's homepage deployed at least 9 cookies, 18 third-party tracker requests, 1 canvas-fingerprinting instance, 1 Microsoft Clarity session recorder, and 1 key-logging instance. Forensic testing of BeenVerified's subscription page likewise confirmed at least 20 cookies, 49 third-party tracker requests, 2 canvas-fingerprinting instances, and 1 Microsoft Clarity session recorder. These technologies were active in the context of a people-search and subscription workflow where users enter, search, review, and potentially purchase access to identity-related information.

6. The Microsoft Clarity session recorder captured or was capable of capturing complete user-session data, including screen interactions, mouse movements, clicks, scroll behavior, form interactions, and keyboard-input events. The homepage testing detected a key-logging instance through first-party BeenVerified code that captured keyboard input events. The subscription-page testing detected Microsoft Clarity operating on a payment/account-creation page, where users may enter or interact with personal, financial, and subscription information.

7. The Website also deployed canvas fingerprinting through Google Tag Manager and MaxMind Device Detection. Canvas fingerprinting causes a user's browser and device to render fonts and graphics, reads the resulting canvas data, and converts the rendering characteristics into a highly persistent browser/device signature. Unlike ordinary cookies, this signature can persist

across sessions and can continue identifying the same user even after the user deletes cookies or attempts to restrict ordinary cookie-based tracking.

8. Defendant also caused Plaintiff's browser to store and transmit persistent identifiers, cookies, local-storage values, session-storage values, device identifiers, IP addresses, browser and user-agent information, referring/entry URLs, timestamps, page categories, flow categories, session identifiers, fraud-prevention identifiers, marketing identifiers, and other routing, addressing, and signaling information. On the subscription page, for example, testing detected persistent or semi-persistent identifiers including, among others, bv_sess, bv_ent, bv_sup, dfpfpt, __mmapiwsid, fptctx2, __anon_id, and other values used to identify, route, correlate, and analyze user activity.

9. These transmissions occurred automatically, in real time, and before Plaintiff and Class Members could provide meaningful consent. The communications were intercepted while being sent from, or received at, Plaintiff's browser in California. The Trackers operated through JavaScript event listeners, image/beacon requests, fetch/XMLHttpRequest calls, script calls, iframe calls, cookie reads/writes, local-storage reads/writes, session-storage reads/writes, and other browser processes that transmitted Plaintiff's communications and metadata to BeenVerified and third-party domains contemporaneously with Plaintiff's Website activity.

10. Defendant did not obtain Plaintiff's or Class Members' prior consent to the installation, operation, recording, fingerprinting, interception, disclosure, and use of the Trackers. Nor did Defendant obtain a court order authorizing the installation or use of any pen register, trap-and-trace device, or equivalent device or process.

11. Defendant's cookie banner did not provide meaningful notice or consent for the challenged conduct. The banner referred to "cookies" used to "enhance site navigation, analyze site usage, and assist in our marketing efforts," but did not disclose that Defendant would record sessions, capture keyboard-input events, create persistent canvas fingerprints, transmit search and report-related communications to Microsoft, Google, MaxMind, and other third parties, or permit third parties to use those communications and identifiers for their own analytics, fraud-prevention, profiling, advertising, product-improvement, or other commercial purposes.

12. Plaintiff saw a cookie notice or banner and did not click "Accept All Cookies." Plaintiff rejected cookies, did not change cookie settings beyond rejecting cookies, and did not see any separate consent pop-up before the challenged tracking occurred. Regardless, the Trackers were deployed and transmitted data before any meaningful consent and continued to operate even where non-essential cookie categories were disabled.

13. Plaintiff suffered concrete injury. Plaintiff visited the Website to investigate what personal information BeenVerified was publishing, selling, previewing, or making available about him. The fact that Plaintiff searched for himself, his phone number, his name, his address information, and information concerning his mother, wife, friends, and other family members was itself private, sensitive, and not information Plaintiff expected to be disclosed to Microsoft, Google, MaxMind, PayPal/Braintree, or other third-party tracking vendors. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

14. Defendant's conduct caused Plaintiff to lose control over private and identity-related Website communications; caused disclosure of Plaintiff's personal search activity and identifying information to third parties; caused the creation of persistent identifiers associated with Plaintiff's browser/device; caused Plaintiff to receive advertisements for other websites that allow users to search people's information after his BeenVerified visits; caused Plaintiff to expend time attempting to locate browser-history records and emails relating to his visits; consumed Plaintiff's device, browser, storage, bandwidth, CPU, battery, and internet resources; and caused Plaintiff concern, anxiety, distress, and loss of peace of mind because Plaintiff's private search activity on a people-search website was recorded and disclosed without consent.

15. Because the Trackers intercept information about the Website visitors' interactions with the Website, the Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA").

16. Because the Trackers also capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of CIPA. See *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023). By installing

and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

17. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of the ECPA and CIPA.

**PARTIES**

18. Plaintiff Sherif Sherif resides in San Francisco, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when he visited the Website.

19. Defendant Beenverified, LLC., is a Delaware Limited Liability Company, with its principal place of business located in New York.

**VENUE AND JURISDICTION**

20. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff, and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant, there are more than 100 putative Class Members, and the amount in controversy exceeds $5 million, exclusive of interest and costs. This Court has jurisdiction over Defendant because Defendant operates in and directs commerce to this District. Defendant intentionally avails itself of the markets within this District, rendering the exercise of jurisdiction by this Court just and proper. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Plaintiff resides in this District

## I. INTRODUCTION

### A. The California Invasion of Privacy Act

1. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

2. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also *Greenley, supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

3. Individuals may bring an action against the violator of any provision of CIPA—including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Federal Wiretap Act**

4. The ECPA was originally enacted in October 1986 to extend privacy protections to emerging technologies. In drafting the legislation, Congress acknowledged that "[t]he dramatic development of the Internet has transformed methods of gathering, processing and sharing information." Senate Judiciary Committee Report (S. Rep. No. 99-541, 1986). Therefore, the statute aimed to address "individuals' concerns that a sufficient degree of privacy and the integrity of personal information are maintained in an age of modern communications and information storage." *Id.*

5. Although limiting overreach by law enforcement was one of the main purposes of the statute, the ECPA explicitly applies to private actors, including "any individual, partnership, association, joint stock company, trust, or corporation" who illegally intercepts, or attempts to intercept, "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C.A. § 2510(4)(6).

6. The statute authorizes individuals to recover civil damages of up to $10,000 from any person who violates the provisions of the ECPA.

## II. DEFENDANT ILLEGALLY INTERCEPTS THE CONTENTS OF ELECTRONIC AND WIRE COMMUNICATIONS AND ILLEGALLY CAPTURES IDENTIFYING INFORMATION

### A. Overview of Website Tracking Technology

7. Website tracking technology originally consisted of simple tools such as first-party cookies accessible only by the domain (website address) that set the cookies. However, as online advertising and analytics advanced, the industry increasingly relied on third party cookies which are set and accessed by domains other than the website a user originally visited. Over time, websites began implementing techniques which enabled the sharing of data collected by first-party cookies with third party domains, giving them access to user activity.

8. In addition to first-party and third-party cookies, the technology has further evolved into an advanced and interconnected system of methods that are capable of tracking the behavior of users across multiple websites, devices, and sessions using tools such as pixels, device "fingerprinting," and other real-time data exchanges.

#### *i. Cookies*

9. A cookie is a small text string with data created by a website's server and transmitted to a web browser, which then stores the string on the user's device. When the user revisits the website, the browser sends the string along with the HTTP request, allowing the tracker to recognize the user and build sophisticated profiles. These cookies can remain on the device for years, enabling long-term tracking and profiling.

10. When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

11. Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their device, as the process occurs in the background without any visible signs.

***ii. Device fingerprinting***

12. Device fingerprinting refers to a broad category of techniques that are used to identify a user's device across visits (also called "sessions"). It works by collecting information about a user's hardware and software attributes, such as browser type, operating system, screen resolution, installed fonts, and time zone and language settings. The combination of these attributes becomes the user's "device fingerprint."

13. When combined, the probability that two users have identical attributes and settings is very low, even if they have the same type of device or browser. This is because the technical characteristics still vary based on individual configuration and software versions, which allow trackers to accurately and uniquely identify users without relying on cookies.

14. Canvas fingerprinting is a specific type of device fingerprinting that identifies and tracks a user's device based on these unique characteristics. It works by downloading a Javascript code when a user visits a webpage and runs it in the user's browser. This initiates a process completely invisible to a user.

15. The Javascript creates an invisible HTML canvas element—like a digital drawing board—and draws texts, shapes, and emojis on the canvas using various fonts and colors. The script then reads back the exact pixel values of what it just drew and runs these pixels through a mathematical function (a "hash") that converts them into a "unique identifier." This unique identifier becomes the user's "device fingerprint."

16. The Javascript sends this fingerprint to a server, and the server uses it to recognize a user on future visits, without the use of any cookies.

17. The reason this process creates a unique identifier is because devices render graphics slightly differently based on their graphics card model, driver version, installed fonts, operating systems, screen resolution, and color calibration. These tiny variations create a unique pattern—like a fingerprint—that is remarkably stable and hard to change. This fingerprint persists even if a user clears their browser data.

***iii. IP Addresses***

18. IP addresses serve an important functional role on the internet by acting like a digital postal address that allows devices to send and receive data.

19. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

20. Functionally, to make a website load on a user's internet browser, the browser sends an "HTTP request" to Defendant's server where the relevant website data is stored.

21. In response to the request, Defendant's server sends an HTTP response back to the browser with a set of instructions.

22. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

23. Thus, the IP address enables a device to communicate with another device, such as a computer's browser communicating with a server.

24. However, IP addresses can also be used as potential user identifiers, especially when used in combination with additional data collected from the techniques described above.

25. Through an IP address, the specific device's state, city, and zip code can be determined.

26. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device or household Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."

27. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code" and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests." Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service" because "[c]ompanies can use an IP address … to personally identify individuals."

28. For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis. Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising." "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."

29. In addition, "IP address targeting can help businesses to improve their overall marketing strategy." "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."

30. Public IP addresses enable companies to monitor user interactions and behaviors across various websites and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

31. They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

32. By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

33. For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

34. For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

***iv. Session recording***

35. Session recording tools capture and replay user interactions on websites, creating a video-like recording of browsing sessions. They monitor mouse movements (every pixel traveled), clicks (what you clicked and where), scrolling (how far, how fast), form inputs (what you type, including deletions), page navigation (every page visited), and time spent on each element.

36. Importantly, session recording is qualitatively different from cookies or analytics. It is not just counting pageviews—it is creating a surveillance video of a user's online behavior.

37. Session recorders are highly invasive because of the level of nuance captured during a session. Because it captures deleted content, if a user types a message and deletes it, the recording captures exactly what they explicitly chose not to submit. It also reveals other user behaviors such as user hesitation, since it can record how long a use hovered over a "Buy Now" button before clicking on it (or not).

38. Session recorders have the potential to capture sensitive data such as passwords, credit cards, and health information, if not properly configured.

39. Moreover, real people at the companies who own the session recording technology have the ability to watch replays of user sessions and recordings are stored indefinitely for analysis.

**B. Defendant's Specific Tracking Architecture and Real-Time Data Flow**

40. BeenVerified's Website operates by sending code from BeenVerified controlled servers to a user's browser. That code instructs the browser not only to request and display BeenVerified content, but also to contact third-party domains, download third-party scripts, store identifiers, read device characteristics, and transmit user-interaction data to third parties.

41. When Plaintiff's browser requested the Website from California, BeenVerified's servers responded with HTML, JavaScript, tags, and instructions that caused Plaintiff's browser to load third-party scripts and resources from, among others, Microsoft, Google, MaxMind, Cloudflare, OneTrust/CookieLaw, Braintree/PayPal/Google Pay, TokenEx, DigiCert, and AccessiBe. These third parties were not the intended recipients of Plaintiff's search communications with BeenVerified and were not necessary for Plaintiff to communicate his search request to BeenVerified.

42. The Trackers operated by registering event listeners and browser processes that responded to Plaintiff's real-time actions. When Plaintiff typed his phone number, his name, Sherif Sherif, Plaintiff's addresses, and names, addresses, and phone numbers for his mother, wife, friends, and other family members; clicked search buttons, links, and selected or used people-search, reverse-phone-lookup, and address-search functions; scrolled through pages; or interacted with search fields or the Trackers captured the event, associated it with persistent identifiers, and transmitted event data to third-party endpoints. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

43. These transmissions were contemporaneous. They occurred at the moment of, or within milliseconds/seconds of, Plaintiff's browser activity and while the relevant communications were being sent from or received by Plaintiff's browser. The Trackers did not merely access archived or stored records after the fact; they acquired Plaintiff's communications during transmission by intercepting browser events, DOM interactions, network requests, cookies, storage values, and browser/device attributes in real time.

44. Microsoft Clarity was deployed globally on the Website and created session-replay and heatmap data. Clarity's code captured Plaintiff's user-session events and transmitted them to Microsoft-controlled servers, where Microsoft processed the data into session replays, heatmaps, event timelines, analytics, and other behavioral records available to BeenVerified and useful to Microsoft for product, analytics, anti-fraud, advertising, benchmarking, or other commercial purposes.

45. Google Tag Manager was deployed under container ID GTM-HV76 and orchestrated other tags and tracking code. Google Tag Manager transmitted data regarding Plaintiff's search-submission activity, device/browser characteristics, tag events, and related identifiers to Google-controlled infrastructure. When Plaintiff was logged into a Google account or otherwise associated with Google identifiers, Google could associate the Website communications with Google-held user identifiers, cookies, advertising IDs, or account data.

46. MaxMind Device Detection was deployed to collect device and browser characteristics, including canvas-rendering outputs, for device identification. The MaxMind script

caused Plaintiff's browser to perform canvas font rendering, canvas geometry rendering, and data-URL extraction, then transmitted or made available a device signature that could be used to persistently recognize Plaintiff's browser/device.

47. The subscription/payment pages deployed additional payment and analytics scripts, including Braintree/PayPal/Google Pay and TokenEx. These scripts were loaded on pages where users select plans, enter or interact with payment information, and create or manage subscriptions. The presence of these scripts on sensitive account/payment flows increased the privacy risk and the likelihood that users' account, subscription, payment-method, and identity-related interactions were captured or exposed.

48. Defendant knew how these Trackers worked. Defendant intentionally selected and embedded the Trackers, configured accounts and container IDs, installed or authorized the JavaScript snippets, chose where the scripts would fire, chose whether to mask or exclude sensitive fields, chose whether to block the Trackers before consent, and received the benefit of analytics, replay, fraud-prevention, conversion, payment, and advertising functions. Defendant's own cookie banner and privacy controls demonstrate Defendant's knowledge that consent and user choice were required before storing, reading, collecting, or transmitting user information.

49. Defendant nevertheless configured the Website so that the Trackers were active before Plaintiff gave meaningful consent and, regardless of whether Plaintiff disabled non-essential categories. Defendant thereby knowingly caused Plaintiff's browser and device to execute code, store identifiers, collect communications, disclose communications, and transmit routing, addressing, signaling, and content information to third parties without Plaintiff's permission.

**<u>C. Tracking Technology on Defendant's Website</u>**

50. Using a combination of the tracking technologies described above, Defendant actively shared user data with multiple third parties, including Google and Microsoft, by deploying tools and scripts developed by these companies that collected, transmitted, and processed information from users who accessed the Website.

51. Specifically, forensic testing confirmed that the Website deployed 49 third-party trackers, including 20 cookies, 2 different canvas fingerprints, and a session recorder.

***i. Session Recorders***

52. Defendant deployed a session recorder on the Website using scripts and tools developed and operated by Microsoft.

53. The session recorders on Defendant's Website captures a user's entire session visually, recording a user's cursor movements, clicks, and page scrolling behavior.

54. As explained above, the session recorders are highly invasive for several reasons, including the fact they capture all of a user's keyboard input, even if the information is not eventually submitted to the Website by the user.

55. This is especially concerning because the Website processes highly sensitive personal information including social security numbers, addresses, and background check data. Session recordings capture this sensitive data as users navigate through the subscription and search processes.

56. Website users are unaware that their entire browsing session is being recorded on the people search website that already collects extensive personal data.

57. Microsoft retainers session recording for up to 90 days, during which complete user behavior patterns, and potentially sensitive search queries, are stored and viewable by third parties.

***ii. Google Tracking Technology***

58. Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising bringing in a grand total of $305.6 billion. Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level.

59. The Website uses Google Tag Manager to deploy a script to perform canvas fingerprinting. This unique identifier is what allows Defendant and Google to track users across multiple websites.

60. Finally, if the user is logged into their Google account when visiting the Website, Google receives third party cookies allowing it to link the data collected by the code to the specific Google user, and derive demographic information about that user, such as age and gender.

***iii. Canvas Fingerprinting***

61. Defendant implements extensive canvas fingerprinting on the Website across multiple third-party services, deploying 2 separate scripts from Google and MaxMind Device Detection.

62. By integrating separate fingerprinting instances across two different vendors, this creates a highly unique and persistent identifier that can track users across sessions and websites.

63. The information on consumer behavior gathered by has tremendous value to advertisers and to the Defendant. Similar market research on consumer behavior can increase overall sales by millions of dollars. In this way, Defendant and the advertisers have stolen information from Plaintiff, and the Class Members, of significant value. Participants in focus groups, for instance, are regularly paid $30-$500 per session. But instead of paying Plaintiff and the Class, Defendant and the Third Parties stole the information from Plaintiff and the Class.

**D. Defendant Aided and Abetted Third-Party Interception by Installing and Using Trackers on the Website to Collect Plaintiff's and Class Member's Communications Without Consent or Court Order**

64. Section 631 of CIPA prohibits the interception of communications without the consent of all parties and provides that a person who aids, abets, employs, or conspires with another to intercept communications may also be liable. Cal. Penal Code § 631(a).

65. In the internet context, courts repeatedly recognize that a third party becomes an unauthorized interceptor when a website embeds tracking technology that captures user communications in real time and permits the third party to use the intercepted communications for its owner commercial purposes. See *Smith v. Rack Room Shoes, Inc*., 2025 WL 1085169 at *4 (N.D. Cal. Apr. 4, 2025)(rejecting the argument that the trackers were not unauthorized third parties but "extensions" of the website); *Ambriz v. Google, LLC*, 2025 WL 830450 (third party trackers who have the capability to use the information transmitted are unauthorized parties regardless of their intent).

66. Defendant owns and operates the Website, https://www.beenverified.com/, is a public records search engine which allows users to perform background checks, people searches, reverse phone and email lookups, and vehicle or property searches.

67. Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and other users visited the Website. Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

68. As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser so that it can be executed within the context of that website. Scripts, including tracking software, must be (re-)installed into the browser for each website that uses them, and so Defendant is solely responsible for the installation of the tracking software that will execute on its website.

69. Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the identifying information and user behavior and activity from Class Members and transmits that data to the third-parties that developed and operate the Trackers in real time.

70. The operators of the Trackers then use the correlated information of users, including those of Plaintiff and Class Members, for their own commercial purposes, including targeted advertising, marketing, and website analytics.

71. Plaintiff and Class Members did not consent to the challenged tracking, recording, fingerprinting, interception, disclosure, or use. Consent was not obtained before the Trackers were installed, executed, and used.

72. Defendant's banner did not disclose the material facts necessary for consent. It did not disclose that Microsoft Clarity would record complete user sessions or generate session replays; that keyboard-input events were captured on the homepage; that Google Tag Manager and MaxMind Device Detection would perform canvas fingerprinting; that canvas fingerprinting creates persistent identifiers not controlled by ordinary cookie deletion; that third-party vendors would receive the substance of search, report, subscription, account, payment, and browsing

communications; or that third-party vendors could use the data for their own commercial, analytics, fraud-prevention, advertising, product-improvement, or profiling purposes.

73. The banner was framed as a cookie-storage notice, not as an all-party consent request for recording, eavesdropping, key-input capture, session replay, canvas fingerprinting, disclosure of Website communications, pen-register/trap-and-trace processes, or third-party interception. A reasonable user would not understand the phrase "enhance site navigation, analyze site usage, and assist in our marketing efforts" to mean that Defendant and its vendors would record the user's session, capture form interactions, capture keystroke events, create persistent device fingerprints, and transmit people-search communications to Microsoft, Google, MaxMind, and other third parties.

74. Plaintiff did not click "Accept All Cookies." Plaintiff saw a cookie notice or banner and rejected cookies. Plaintiff did not change cookie settings beyond rejecting cookies, and did not see any separate consent pop-up. Plaintiff did not authorize Defendant to install or execute session replay, key input capture, or canvas-fingerprinting code, and did not authorize Microsoft, Google, MaxMind, or other third parties to receive or use the contents or addressing information of Plaintiff's Website communications.

75. Even if Defendant contends that Plaintiff consented to ordinary cookies, any such consent did not extend to non-cookie technologies, including session replay, key-input event capture, canvas fingerprinting, local storage, session storage, device identifiers, IP-based geolocation, or transmission of communications to third parties for their own purposes.

76. Defendant did not obtain a court order authorizing any pen register, trap-and-trace device, or equivalent process. Defendant is not a peace officer or law-enforcement agency and had no statutory authorization to install or use processes that recorded or decoded Plaintiff's routing, addressing, or signaling information

77. Under the ECPA, the consent of one party is also insufficient where "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); see also, *Doe v. Meta Platforms, Inc.* (N.D. Cal. 2023) 690 F. Supp. 3d 1064, 1077.

78. Because Defendant's interception and disclosure of the communications also violates CIPA, as well as California's Comprehensive Data Access and Fraud Act and the right to privacy under the California Constitution, discussed *infra*, consent by United alone is insufficient to shield it from liability under the ECPA. See *Smith v. Rack Room Shoes, Inc.*, *supra,* 2025 WL 1085169 at *5 (the website tracking allegations are analogous to the purpose of engaging in a HIPPA violation, which courts consistently find constitutes an independent prohibited purpose.").

**E. Defendant's Conduct Constitutes an Unauthorized Interception of the Contents of Communications under CIPA and the ECPA**

79. Plaintiff's Website communications contained "contents" because they conveyed the substance, purport, and meaning of Plaintiff's messages and interactions with BeenVerified. Those contents included, without limitation, Plaintiff's search queries for his phone number, name, and addresses; the fact that Plaintiff was searching a people-search website for himself and for information concerning his mother, wife, friends, and other family members; the search categories selected or used; the buttons and links Plaintiff clicked; and Plaintiff's real-time behavioral interactions with the Website. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

80. These contents reveal far more than a device's IP address or browser type. They reveal Plaintiff's private investigatory purpose, the identity information Plaintiff submitted for searching, and what specific information Plaintiff submitted in search queries.

81. For example, Plaintiff typed his phone number into the Website's search field, typed the name into the people-search field, typed his address information, searched for names, addresses, and phone numbers concerning his mother, wife, friends, and other family members, selected or used people-search, reverse-phone-lookup, and address-search functions, clicked search buttons, links from the Website. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address, did not search for an email address, did not create an account, did not purchase a subscription, did not enter payment information, and did not reach a checkout or payment page. Each such action communicated a substantive message to BeenVerified: what

Plaintiff wanted searched, what pages and controls Plaintiff selected, and what personal data Plaintiff was attempting to locate or manage.

82. Microsoft Clarity captured or was capable of capturing these communications as a session-replay event stream. Microsoft Clarity's recording process captured screen interactions, mouse movement, clicks, scroll behavior, form interactions, and keyboard-input activity in real time. The resulting event stream enabled Microsoft and BeenVerified to recreate Plaintiff's Website visit and infer the meaning of Plaintiff's communications.

83. The homepage key-logging instance captured keyboard input events in real time. The key-input capture was not limited to a final submitted form. It captured input events as they occurred, including characters or values typed, partially typed, modified, or deleted, and therefore captured communications Plaintiff had not necessarily chosen to submit to BeenVerified.

84. Google Tag Manager and MaxMind Device Detection captured canvas-rendering outputs and associated those outputs with Plaintiff's Website communications, identifiers, browser, device, and page activity. This allowed Plaintiff's communications to be linked to a persistent browser/device identity and correlated across sessions.

85. The Trackers intercepted communications contemporaneously with transmission. The Trackers were not accessing a database after communications were stored. Rather, they executed inside Plaintiff's browser and acquired event data as Plaintiff submitted searches on the Website. When Plaintiff submitted search queries, the scripts captured those search-submission events and transmitted them to third-party servers as part of the same browser-session communication flow.

86. The third-party vendors were independent entities, not parties to Plaintiff's intended communications with BeenVerified. Plaintiff intended to communicate with BeenVerified to submit searches for personal information. Plaintiff did not intend to communicate his submitted search terms or device fingerprint to Microsoft, Google, MaxMind, or other third-party vendors.

87. The third-party vendors had the technical ability to receive, process, store, analyze, replay, aggregate, correlate, and use Plaintiff's Website communications. Microsoft, Google, MaxMind, and other vendors used the intercepted communications and identifiers for their own

commercial purposes, including analytics, fraud prevention, product improvement, benchmarking, advertising, retargeting, identity resolution, device recognition, and cross-site or cross-session profiling.

88. Defendant knowingly aided, agreed with, employed, and conspired with the third-party vendors to intercept and use the communications. Defendant intentionally embedded third-party code, configured tag containers and vendor accounts, chose where the code would load, caused the code to execute in Plaintiff's browser, permitted the code to transmit data to third-party servers, and benefited from the resulting analytics, recordings, heatmaps, conversion tracking, fraud-prevention signals, payment analytics, advertising, and user-profiling functions.

89. Defendant knew the full nature of the third-party data collection because the Trackers' ordinary and advertised functions include session recording, heatmaps, form-interaction analytics, device detection, tag firing, fraud detection, advertising, and conversion analytics. Defendant could have disabled session recording, blocked transmission before consent, excluded sensitive pages, masked fields, limited third-party use, or avoided deploying the Trackers on people-search and subscription pages. Defendant chose not to do so.

90. Defendant's conduct was willful and intentional. The challenged transmissions occurred because Defendant affirmatively programmed the Website to send Plaintiff's browser the third-party scripts and identifiers. The challenged interception was not accidental, incidental, or caused by Plaintiff. It was the intended function of Defendant's tracking architecture.

91. To the extent Defendant contends that it consented to the interception as a party to the communication, such consent is ineffective under the Wiretap Act because Defendant procured, disclosed, and used the communications for the purpose of committing tortious and unlawful acts, including violations of CIPA, CDAFA, and the California constitutional right to privacy, and for the purpose of obtaining an economic benefit from the surreptitious collection, disclosure, and use of Plaintiff's private Website communications without meaningful consent.

92. Defendant's conduct therefore constituted direct interception, use, and disclosure under CIPA and the Wiretap Act and, with respect to the Wiretap Act, Defendant also intentionally

procured Microsoft, Google, MaxMind, and other vendors to intercept Plaintiff's electronic communications.

93. Because the Trackers intercept information about the Website visitors' interactions with the Website, Defendant's use of the Trackers constitutes an unlawful interception and disclosure of an "electronic communication" under Section 2511 of the ECPA.

94. Defendant's use of the Trackers also constitutes an "unauthorized connection" which "reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication" under Section 631 of CIPA.

95. "Contents" of a communication refer to "any information concerning the substance, purport, or meaning of a communication." *In re Zynga Priv. Litig*. (9th Cir. 2014)750 F.3d 1098, 1106–07)(internal quotations omitted). This includes button clicks, viewing history, cart history, or any other information that reveals a user's personal interests, queries, or habits. See also, *Mikulsky v. Bloomingdale's, LLC*, 2025 WL 1718225, at *1 (9th Cir. June 20, 2025)(session recording technology constitutes "contents" for the purposes of Section 631 of CIPA).

96. The communications intercepted by the Trackers, which include a session recorder, are "contents" within the meaning of CIPA and the ECPA because they reveal substantive information about the user's interests, preferences, and potential consumer behavior.

**F. Defendant's Conduct Constitutes an Illegal Pen Register and Trap and Trace Device Under CIPA**

97. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

98. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

99. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

100. In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

101. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

102. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address(es) the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

103. Defendant installed and used devices and processes that recorded and decoded routing, addressing, and signaling information transmitted by Plaintiff's browser, computer, and internet connection. These devices and processes included the Website's embedded JavaScript, Google Tag Manager, MaxMind Device Detection, Microsoft Clarity, cookies, local-storage identifiers, session-storage identifiers, beacons, pixels, image requests, script requests, fingerprinting processes, and third-party network calls.

104. The Trackers recorded or decoded outgoing routing, addressing, and signaling information, including Plaintiff's IP address, user-agent string, browser and device attributes, canvas fingerprint, session identifiers, cookie identifiers, local-storage identifiers, page URLs, URL paths, referring URLs, entry URLs, timestamps, page categories, selected search categories, destination domains, and third-party endpoints contacted by Plaintiff's browser.

105. The Trackers also captured incoming routing, addressing, and signaling information reasonably likely to identify the source of communications to Plaintiff's browser, including

response sources, script origins, tag origins, third-party domains, and identifiers linking Plaintiff's browser to prior and future communications.

106. These identifiers were reasonably likely to identify Plaintiff as the source of the Website communications. Plaintiff's IP address identified Plaintiff's approximate geographic location and internet connection. The cookies and local-storage values identified Plaintiff's browser/session. The canvas fingerprint identified Plaintiff's device/browser configuration. The Google, MaxMind, Microsoft, and other vendor identifiers enabled correlation of Plaintiff's Website activity across pages, sessions, and potentially other websites.

107. Defendant's use of these processes went beyond ordinary server logs necessary to deliver a webpage. Defendant installed code on Plaintiff's browser and caused Plaintiff's browser to generate, store, and transmit persistent identifiers and device signatures to third parties. The processes were designed to identify, route, correlate, recognize, and analyze Plaintiff's browser/device and communications across Website pages and sessions.

108. Defendant did not merely receive routing information as the ordinary addressee of a webpage request. Defendant caused Plaintiff's browser to transmit routing, addressing, and signaling information to third parties who were not the intended recipients of Plaintiff's search communications. Those third parties used the information to identify Plaintiff's browser/device, attribute activity, perform analytics, create replay/heatmap records, detect fraud, and support advertising or marketing functions.

109. Defendant installed and used these pen-register and trap-and-trace processes without first obtaining a court order. Defendant had no law-enforcement authorization, no statutory exception, and no user consent for the installation or use of these processes.

110. Plaintiff's § 638.51 claim is limited to Defendant's intentional installation and use of third-party surveillance and identification processes that record and decode Plaintiff's routing, addressing, and signaling information for tracking, profiling, analytics, replay, fraud-prevention, advertising, or monetization purposes. Plaintiff does not challenge ordinary server operations necessary to deliver web content.

111. The Trackers are "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

112. The Trackers are a "device" because "in order for software to work it must be ran on some kind of computing device." *James v. Walt Disney Co*., 701 F.Supp.3d 942 (N.D. Cal. Nov. 8, 2023).

113. Because the Trackers capture outgoing information that capture the source of a communication, they are a "pen register" for the purposes of CIPA section 638.50(b).

**G. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

114. The collection of Plaintiff's and Class Members' personally identifying, nonanonymized identifying information, and Website activity through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

115. As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

## III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES

116. Plaintiff Sherif Sherif is a California resident who was physically located in San Francisco, California when he visited the Website on or about October 2025, November 2025, and December 2025 using his laptop, and browsers including Google Chrome and Internet Explorer .

117. Plaintiff visited the Website because he wanted to determine what personal information BeenVerified was publishing, previewing, selling, or making available about him. Plaintiff searched for his phone number, his name, his address information, and information concerning his mother, wife, friends, and other family members. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

118. Plaintiff's visit was private and sensitive. Plaintiff did not visit the Website merely to browse retail products. Plaintiff was investigating the availability, content, accuracy, and potential exposure of his own personal information on a people-search website, including his phone number, current and former address information, relatives/associates information, property information, and personal information concerning his mother, wife, friends, and other family

members. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address.

119. During the visits, Plaintiff typed his phone number, his name, his address information, and names, addresses, and phone numbers concerning his mother, wife, friends, and other family members; clicked search buttons, links, and selected or used people-search, reverse-phone-lookup, and address-search functions; scrolled through pages; and interacted with search. Plaintiff was ultimately unable to view the results because he did not want to enter his e-mail address, did not search for an email address, did not create an account, did not begin or purchase a subscription, did not enter payment information, did not reach a checkout or payment page, and paid no amount to BeenVerified.

120. Before Plaintiff gave any meaningful consent, the Website caused the Trackers to execute inside Plaintiff's browser. The Trackers captured and transmitted Plaintiff's IP address, browser/device information, page URLs, page paths, entry/referral URLs, search category, search-related activity, cookie identifiers, local-storage identifiers, session-storage identifiers, canvas fingerprint, clicks, scrolls, mouse movements, form interactions, and keyboard-input events.

121. Plaintiff did not consent to session recording, key-input capture, canvas fingerprinting, disclosure of search communications to Microsoft, Google, MaxMind, or other third parties, or use of his Website communications for third-party analytics, advertising, profiling, product improvement, or fraud-prevention purposes. Plaintiff saw a cookie notice or banner, rejected cookies, did not accept cookies, did not change cookie settings beyond rejecting cookies, and did not see any separate consent pop-up. Plaintiff was not logged into any Google, Microsoft, Apple ID, Yahoo, or other online account while visiting the Website. Plaintiff did not use a VPN, ad blocker, privacy extension, incognito/private browsing mode, or similar privacy tool during his visit.

122. Plaintiff did not see any notice stating that his session would be recorded, that his keyboard-input events could be captured, that canvas fingerprinting would be used to create a persistent device signature, or that his people-search activity would be transmitted to third-party

vendors. Plaintiff would not have used the Website, would have used materially different privacy tools, and would not have submitted searches through the Website had he known these facts.

123. After Plaintiff's visits, Plaintiff received advertisements for other websites that allow users to search people's information. Plaintiff does not presently recall the precise dates, platforms, frequency, or examples of those advertisements, but the advertisements were unusual because they related to the same category of people-search and information-search services for which Plaintiff had submitted searches on BeenVerified and appeared after his visits.

124. Plaintiff also spent time attempting to locate browser-history records and emails relating to his visits. Plaintiff has not identified specific out-of-pocket mitigation costs at this time. Defendant's unauthorized code and transmissions consumed Plaintiff's device, browser, storage, bandwidth, CPU, battery, and internet resources.

125. Each of the Trackers described above are found on the Website. Therefore, when Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browsers.

126. Defendant used the information collected by the Trackers and shared it with third parties to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's locations, and ultimately boost Defendant's and advertisers' revenue.

127. Although Defendant uses at least several different Trackers on the Website, they all operate in the same manner and perform the same function, i.e., collecting Plaintiff's and Class Members' identifying information and Website activity. Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the purpose of collecting IP addresses and other user behavior data associated with the Plaintiff and Class Members.

128. Plaintiff and Class Members did not provide their prior consent to Defendant to install or use the Trackers on their browsers.

129. Defendant did not obtain a court order before installing or using the Trackers.

130. Thus, like Plaintiffs, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a).

131. Plaintiff seeks prospective relief requiring Defendant to disable session recording, key-input capture, fingerprinting, and third-party tracking before meaningful consent; honor rejection, opt-out, and GPC signals; provide clear notice of all third-party tracking and vendor purposes; delete unlawfully collected communications and identifiers; and prevent further interception and disclosure of Plaintiff's Website communications.

## CLASS ACTION ALLEGATIONS

132. Class Representative Plaintiff brings this action on their own behalf and on behalf of all other persons similarly situated. The putative class that Class Representative Plaintiffs seek to represent is composed of:

**Nationwide Class**

All United States residents who accessed the Website and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent two years prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Class").

**California subclass**

All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent one year prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Subclass").

133. Excluded from the Class are the natural persons who are directors, and officers, of the Defendant, as well as judicial officers and attorneys of record, their families, and their staff who are assigned to this action. Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

134. Plaintiff is informed and believe that the members of the Class are so numerous that

joinder of all members is impracticable. While the exact number of the Class members is unknown to Class Representative Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

135. There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

136. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Defendant unlawfully read and/or intercepted communications by Plaintiff and members of the Class through use of the Trackers;

(b) Whether the Defendant unlawfully collected routing, addressing, and signaling information from Plaintiff and members of the Class through use of the Trackers;

(c) Whether Defendant violated CIPA section 631(a);

(d) Whether Defendant violated CIPA section 638.51(a);

(e) Whether Defendant violated the Wiretap Act, 28 U.S.C. section 2510 et seq.;

(f) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);

(g) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(h) Whether Defendant sought or obtained a court order for its use of the Trackers; and

(i) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiffs, like every other Class member, were exposed to virtually identical conduct and are entitled to the same relief under the CIPA.

137. Class Representative Plaintiff will fairly and adequately protect the interests of the Class. Moreover, Class Representative Plaintiff has no interest that is contrary to or in conflict with those of the Class they seek to represent during the Class Period. In addition, Class Representative Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intend to prosecute this action vigorously.

138. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendant in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

139. Proper and sufficient notice of this action may be provided to the Class members through direct mail.

140. Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the practices of Defendant.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act,**

**Cal. Penal Code § 630, et seq.(a)**

**(California subclass only)**

141. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

142. Plaintiff brings this claim individually and on behalf of the members of the proposed

Class against Defendant.

143. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

144. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id*.

145. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

146. Defendant used tracking software on the Website to intercept and collect information about Website visitors' behavior and activity on the Website.

147. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

148. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

149. The Trackers are "pen registers" because they are "device[s] or process[es]" that

"capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

150. At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers and used the Trackers to collect identifying information of Plaintiff and Class Members, including IP addresses.

151. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

152. Defendant did not obtain a court order to install or use the Trackers.

153. Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 631(a) and 638.51(a), and each seeks injunction and statutory damages of $5,000 for each of Defendant's violations of CIPA section 631(a) and 638.51(a).

## SECOND CAUSE OF ACTION

### Violation of the Wiretap Act

### Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq.*)

154. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

155. The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

156. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

157. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

158. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

159. Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

160. Defendant is a corporation and is therefore a "person" for purposes of § 2510(6).

161. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(a) when it installed Trackers on Plaintiff's browsers, which then intercepted and collected Plaintiff's identifying information, as well as dozens of other data points that revealed Plaintiff's and Class Members' behavior and activity on the Website without their consent.

162. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(c) when it disclosed Plaintiff's and Class Members' identifying information, behavior, and activity, obtained from the Trackers to third parties without their consent.

163. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) when it used Plaintiff's identifying information, behavior, and activity obtained from the Trackers for its own advertising and marketing purposes without their consent.

164. As a result of Defendant's violations of the Wiretap Act, Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights, loss of their information and loss of money and costs incurred, all of which have ascertainable value to be proven at trial.

165. Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

## THIRD CAUSE OF ACTION

**Violation of the California Computer Data Access and Fraud Act**

**(California Penal Code § 502)**

**(California subclass only)**

166. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

167. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

168. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

169. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

170. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

171. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

172. Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

173. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

174. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address are both "data" within the meaning of the statute.

175. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

176. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

177. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

178. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

179. Defendant knowingly accessed and caused third parties to access Plaintiff's computer, browser, browser storage, memory, and data by causing the Website to download, install, execute, read, write, store, process, and transmit code and data through Plaintiff's browser.

180. Defendant's access was without permission. Plaintiff's permission was limited to

retrieving and displaying the Website pages and submitting search communications to BeenVerified. Plaintiff did not give Defendant permission to execute session-replay code, key-input capture, canvas fingerprinting, third-party marketing/analytics tags, or other tracking scripts for the purpose of recording, fingerprinting, copying, transmitting, or monetizing Plaintiff's private Website communications and device identifiers.

181. Plaintiff affirmatively restricted permission by rejecting cookies and not accepting cookies. Plaintiff did not change cookie settings beyond rejecting cookies, and did not see any separate consent pop-up. Defendant knew such permission was absent because Defendant implemented a consent-management interface that asked users to allow or reject certain categories, but nevertheless caused tracking code to execute and transmit data before or despite meaningful consent.

182. Defendant also knew that it lacked permission because the challenged technologies are not ordinary webpage-display code. Session replay, key-input capture, and canvas fingerprinting are invasive monitoring technologies that require disclosure and consent. Defendant's own use of a cookie banner, privacy-preference center, and consent-management cookies confirms that Defendant understood user authorization was required before collecting, storing, or transmitting non-essential tracking data.

183. Defendant knowingly and without permission took, copied, made use of, and caused the transmission of Plaintiff's data, including IP address, browser/device information, canvas fingerprint, cookies, local-storage values, session-storage values, search activity, search-submission data, submitted search inputs, and other Website communications.

184. Defendant knowingly and without permission added, altered, and caused the addition or alteration of data and software on Plaintiff's computer and browser by causing cookies, local-storage values, session-storage values, scripts, identifiers, device fingerprints, and event-listener processes to be stored, executed, or maintained on Plaintiff's browser/device.

185. Defendant knowingly and without permission provided or assisted in providing a means of accessing Plaintiff's computer, browser, computer system, computer network, and data by embedding third-party scripts and tags that allowed Microsoft, Google, MaxMind, and other

vendors to access Plaintiff's browser events, storage, identifiers, and communications.

186. Defendant knowingly and without permission caused Plaintiff's computer, browser, and network connection to communicate with third-party servers, including Microsoft, Google, MaxMind, Cloudflare, OneTrust/CookieLaw, PayPal/Braintree/Google Pay, TokenEx, DigiCert, and other domains, thereby causing output from and data processing with Plaintiff's device and browser resources.

187. Defendant's conduct caused damage and loss. The unauthorized scripts, trackers, cookies, storage values, fingerprinting processes, and third-party transmissions consumed Plaintiff's device, browser, storage, bandwidth, CPU cycles, battery power, memory, browser storage, and internet resources. Plaintiff used his own iPhone and/or laptop and internet connection, and Defendant's unauthorized code and third-party transmissions used a portion of those resources for Defendant's benefit rather than Plaintiff's.

188. Defendant's conduct also caused Plaintiff to spend time, in an amount not yet precisely known, attempting to locate browser-history records and emails relating to his visits. Plaintiff has not identified specific out-of-pocket mitigation costs at this time.

189. Defendant's conduct further caused loss because Plaintiff's private Website communications and identifiers have economic value. Defendant took and used those data for analytics, conversion optimization, advertising, session replay, fraud-prevention, user recognition, and other commercial purposes without paying Plaintiff and without authorization. Plaintiff was deprived of the exclusive use, control, and value of his data.

190. Plaintiff did not purchase a subscription or pay any amount to BeenVerified. Had Defendant disclosed that it would record sessions, capture key-input events, fingerprint Plaintiff's device, and disclose Plaintiff's people-search communications to third parties before or without meaningful consent, Plaintiff would not have used the Website, would not have entered the information he entered, and would not have continued interacting with the Website.

191. Plaintiff's losses were caused by Defendant's unauthorized access and use. The losses were not caused by ordinary webpage delivery; they were caused by non-essential tracking, recording, fingerprinting, and third-party transmissions that exceeded Plaintiff's permission and

served Defendant's commercial purposes.

192. Based on Defendant's unauthorized installation and storage of third-party tracking technology on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

193. Similarly, the installation of the Trackers violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

194. By installing third-party tracking technology, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

195. Further, Defendant's unauthorized collection and disclosure of Plaintiff's and Class members' personally identifying and addressing information to undisclosed third parties violates Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class members' computers, computer systems, or computer networks.

196. Plaintiff and Class members are citizens of California, and used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data and other personally identifying information from within California.

197. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the Website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

198. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an

amount to be determined at trial.

199. Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**FOURTH CAUSE OF ACTION**

**Invasion of Privacy**

**(Violation of Art. 1, § 1, California Constitution)**

**(California subclass only)**

200. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

201. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

202. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

203. Plaintiff and Class Members have a legally protected privacy interest in their personal information, identity-related search activity, people-search communications, submitted search inputs, search-submission activity, device/browser identifiers, persistent fingerprints, IP address, geolocation, and their ability to control the disclosure and dissemination of those data. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

204. Plaintiff had a reasonable expectation of privacy under the circumstances. Plaintiff used a people-search website to investigate what personal information was available about him. A

reasonable California consumer would expect that the fact of searching for oneself, the identifiers typed, the report or personal-data categories viewed, the account/subscription/payment steps taken, and the user's real-time session activity would not be secretly recorded and disclosed to Microsoft, Google, MaxMind, and other third-party tracking vendors before meaningful consent.

205. Defendant's banner and privacy disclosures did not defeat Plaintiff's expectation of privacy. The banner referenced cookie storage for navigation, usage analysis, and marketing assistance, but did not disclose session replay, key-input capture, persistent canvas fingerprinting, real-time transmission of people-search communications, or third-party use of the data for their own commercial purposes. Plaintiff rejected cookies, did not accept cookies, did not change cookie settings beyond rejecting cookies, and did not see any separate consent pop-up, further confirming Plaintiff's expectation that non-essential tracking would not occur.

206. Defendant affirmatively intruded into Plaintiff's protected privacy interests by installing and executing hidden code on Plaintiff's browser; recording Plaintiff's session; capturing keyboard-input events; fingerprinting Plaintiff's device; writing and reading identifiers in cookies, local storage, and session storage; transmitting Plaintiff's Website communications and identifiers to third parties; and allowing third parties to process and use the data.

207. The intrusion was highly offensive and an egregious breach of social norms. Defendant operated a people-search and data-broker service that already aggregates and sells access to personal information. While users were trying to determine what personal information BeenVerified held, displayed, or sold about them, Defendant simultaneously surveilled those users' own search activity through session replay, key-input capture, canvas fingerprinting, and dozens of third-party tracker requests.

208. The nature of the information made the intrusion especially offensive. The Trackers captured or could capture Plaintiff's submitted search terms, personal identifiers, and private concern about his own personal information. This information can reveal whether Plaintiff feared identity exposure or submitted searches concerning background information.

209. The scope and pervasiveness of the intrusion also made it highly offensive. The challenged tracking occurred automatically, before meaningful consent, across multiple pages, with

persistent identifiers, and involved numerous third parties. On the subscription page alone, testing detected 49 third-party tracker requests, 20 cookies, 2 canvas-fingerprinting instances, and a session recorder.

210. Defendant's use of persistent fingerprinting and non-cookie identifiers made the intrusion more offensive because those technologies can defeat ordinary user privacy choices. A user who deletes cookies, rejects non-essential cookies, or attempts to restrict tracking can still be recognized through canvas fingerprints, local-storage values, device identifiers, and vendor-specific tracking IDs.

211. Plaintiff suffered injury, including loss of privacy, loss of control over private Website communications, disclosure of identity-related search activity to third parties, unwanted retargeting and advertising, time and money spent mitigating the tracking, loss of device and network resources, anxiety, and loss of peace of mind.

212. As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

213. Plaintiff and the Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

214. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**(Violations of the CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §17200, *et seq.*)**

215. Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

216. Violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices that constitute "unfair competition" as defined in the UCL, including, but not limited to, the following:

a. by violating the provisions of the CIPA prohibiting unauthorized wiretapping,

Cal. Pen. Code § 631, *et. seq*.;

b. by violating the provisions of the ECPA prohibiting unauthorized wiretapping, 18 U.S.C 2510, *et. seq*.;

c. by violating the provisions of the CIPA prohibiting unauthorized trap and trace, Cal. Pen. Code § 638.51;

d. by violating the CDAFA, Cal. Pen. Code § 502, *et. seq.;*

217. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff. Defendant's practice was also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities do not share, collect, or transmit data without consumer consent, as reflected by laws like the CIPA, Cal. Penal Code §§ 631 & 632, the CDAFA, Cal. Penal Code § 502, *et seq*.; the California Trap and Trace Law, Cal. Penal Code § 638.51; and the ECPA, 18 U.S.C. § 2510, *et. seq*.

218. Defendant engaged in unfair business acts and practices by secretly deploying session replay, key-input capture, canvas fingerprinting, persistent identifiers, and third-party tracking on a people-search website before meaningful consent; by disregarding user privacy choices; by transmitting users' identity-related search communications to third parties; and by monetizing or commercially exploiting those communications and identifiers.

219. Defendant engaged in fraudulent business acts and practices by omitting and concealing material facts from Plaintiff and Class Members, including that Defendant would record user sessions, capture keyboard-input events, fingerprint devices, transmit people-search communications to Microsoft, Google, MaxMind, and other third parties, and allow third parties to process or use the information for commercial purposes. Defendant's cookie banner and privacy controls were likely to mislead reasonable consumers because they framed the challenged conduct as ordinary cookie use for navigation, analytics, and marketing, while omitting the real-time recording, fingerprinting, and third-party interception challenged here.

220. Plaintiff relied on Defendant's omissions. Plaintiff would not have used the Website, would have entered less information, would have used different privacy tools, and would not have submitted searches through the Website had Defendant disclosed the true nature and scope of the

tracking.

221. Plaintiff lost money or property as a result of Defendant's unlawful, unfair, and fraudulent practices. Plaintiff did not purchase a BeenVerified subscription and did not pay any subscription amount to BeenVerified. Plaintiff lost the economic value and exclusive control of his personal data and Website communications, which Defendant treated as valuable property for analytics, advertising, conversion, fraud-prevention, user recognition, and other commercial purposes. Plaintiff also lost device, browser, storage, bandwidth, CPU, battery, and internet resources consumed by unauthorized third-party transmissions, and attempting to mitigate or investigate the disclosure. Plaintiff has not identified specific out-of-pocket mitigation costs at this time.

222. As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiffs were injured and lost money or property, including but not limited to the loss of their legally protected interest in the privacy of their personal information, data, and communications. In addition, Defendant treated the personal information, data, and communications of Plaintiffs as its own property, and sold and/or otherwise used it for profit, causing a loss of money and property to Plaintiffs.

223. Defendant knew or should have known that its sale of information to unauthorized third parties would violate the CIPA, ECPA, and CDAFA. Defendant's actions in engaging in the above-named unfair practice and deceptive acts were intentional, knowing, and willful, and/or wanton and reckless with respect to the rights of the Plaintiffs.

224. Plaintiffs seek relief under the UCL, including declaratory relief, attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief.

## DEMAND FOR JURY TRIAL

225. Plaintiff and the Class hereby demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. For an order certifying the Class, naming Plaintiff as the representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;
2. For an order declaring that Defendant's conduct violates the statutes referenced herein;
3. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;
4. For statutory damages of $5,000 for each violation of CIPA section 631 and 638.51(a);
5. For statutory damages of $10,000 for each violation of the Federal Wiretap Act;
6. For pre- and post-judgment interest on all amounts awarded;
7. For an order of restitution and all other forms of equitable monetary relief; and
8. For an order providing injunctive and other equitable relief as necessary to protect the Plaintiff's interests as requested herein, including, but not limited to:
    a. Ordering that Defendant immediately cease and desist the unauthorized interception, transfer, release, sale, and disclosure of Plaintiffs' data;
    b. Ordering that Defendant remove, block, disable, control, update, manage, and audit any code, software, hardware, operations, systems, policy, procedure, protocols, and processes that allow all unauthorized third parties to intercept, access, copy, collect, take, open, view, monitor, mine, analyze, store, sell, gain, exchange, or otherwise use Plaintiffs' data;
    c. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner data not necessary for its provision of services.
9. For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: June 30, 2026

**POTTER HANDY LLP**

By: /s/ James M. Treglio

James M. Treglio, Esq.
Mark Potter, Esq.
Isabel Rose Masanque, Esq.
Attorneys for Plaintiffs